**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRIST THE KING MANOR, INC., | : | 1:09-cv-2007 |
| *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| KATHLEEN SEBELIUS, *et. al.*, | : | Hon. John E. Jones III |
| | : | |
| Defendants. | : | |

## MEMORANDUM & ORDER

### July 24, 2012

### THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court is Plaintiffs' Motion for Summary Judgment, (doc.

49), the Federal Defendants' Cross Motion for Summary Judgment filed by

Kathleen Sebelius[1] and Donald Berwick,[2] (doc. 51), and the State Defendant's

---

[1] Kathleen Sebelius ("Secretary Sebelius" or the "Secretary") is sued in her capacity as the Secretary of the U.S. Department of Health and Human Services ("HHS"). (*See* Doc. 1 ¶ 5).

[2] Although the complaint names Charlene Frizzera as a Defendant, the Court was apprised on January 13, 2012 that Marilyn Tavenner was being substituted for Ms. Frizzera because Ms. Tavenner had replaced her as the Acting Administrator of the Centers for Medicare and Medicaid Services ("CMS"). (Doc. 75). Hereinafter, we shall refer to these individuals collectively as "the Federal Defendants." Donald Berwick was previously listed as a party therein because he was CMS's Administrator at the time the Federal Defendants' motion was filed. Given the Federal Defendants' January 13, 2012 notice advising that Marilyn Tavenner has been substituted for Charlene Frizzera as CMS's Administrator, Mr. Berwick is no longer a party to the instant litigation.

Motion for Summary Judgment filed by Defendant Michael Nardone.[3]  (Doc. 54).

For the reasons that follow, we shall deny Plaintiffs' motion, and grant the Federal

and State Defendants' motions.

## I.   PROCEDURAL HISTORY

Plaintiffs[4] initiated the instant action by filing a complaint on October 15,

2009.  (*See* Doc. 1).  Secretary Dichter filed the State Motion to Dismiss (the

"State MTD") on December 12, 2009, (doc. 10), and the Federal Defendants filed

the Federal Motion to Dismiss (the "Federal MTD") on January 15, 2010. (Doc.

23).  On June 29, 2010 we issued a memorandum and order denying the Federal

MTD in its entirety and granting in part and denying in part the State MTD.  (Doc.

36 at 27).  We granted the State MTD to the extent it related to the State

Defendant's conduct that predated the Federal Defendants' approval of TN 08-007

and TN 08-008, and also to the extent Plaintiffs sought declaratory and monetary

relief.  (*Id.*).  However, we denied the motion to the extent of Plaintiffs' request for

---

[3] Plaintiffs originally sued Estelle B. Richman ("Richman") in her official capacity as Secretary of Pennsylvania's Department of Public Welfare ("DPW"). (*See* Doc. 1 ¶ 7). Subsequently, Harriet Dichter assumed that position, and was automatically substituted for Ms. Richman as a Defendant in the case at bar.  P. 25(d).  Thereafter, Michael Nardone ("Nardone") was substituted for Ms. Dichter because he replaced Ms. Dichter as the Secretary for Public Welfare for the Commonwealth of Pennsylvania.  (Doc. 53).

[4] Plaintiffs are numerous nursing-facility providers in the Commonwealth of Pennsylvania. (*See* Doc.1 ¶ 4).

injunctive relief regarding the State Defendant's continued implementation of TN 08-007 and TN 08-008.  (*Id.*).

Thereafter, on August 2, 2010 the State and Federal Defendants filed their respective answers to the complaint.  (Docs. 42, 43).  On October 1, 2010, Plaintiffs filed one of the pending motions for summary judgment and a brief in support thereof.  (Docs. 49, 50).  On the same day, the Federal Defendants filed a cross motion for summary judgment and supporting brief, (docs. 51, 52), and the State Defendants filed a motion for summary judgment and brief in support thereof.  (Docs. 54, 55).  Subsequently, on October 25, 2010, Plaintiffs filed a Motion to Strike Federal Defendants' Declaration of Keith T. Leuschner and Their Related Motion for Summary Judgment Supporting Brief, and a brief in support of their motion to strike.  (Docs. 59, 60).  The Federal Defendants filed a brief in opposition to the motion to strike on November 8, 2010, (doc. 62), and Plaintiffs filed a reply brief in further support of their motion on November 16, 2010.  (Doc. 63).  On February 7, 2011, we issued a memorandum and order denying Plaintiffs' motion to strike the declaration of Keith Leuschner ("Leuschner") and the Federal Defendant's brief in support of their summary judgment motion.  (Doc. 64 at 8).

On February 14, 2011, the State Defendant moved to stay all proceedings in the case pending the United States Supreme Court's decision in *Independent Living*

*Center of Southern California v. Maxwell-Jolly*, 572 F.3d 644 (9th Cir. 2009).

(Doc. 65).  After receiving supporting and opposition briefs, we granted the motion

to stay on March 16, 2011 pending the Supreme Court's decision in *Maxwell-Jolly*

*v. Independent Living Center of Southern California*.  (Doc. 70 at 13).  In

compliance with our previous order, the parties submitted a status report on March

2, 2012, advising that the Supreme Court had entered its opinion in *Douglas v.*

*Independent Living Center of Southern California, Inc., et al*, on February 22,

2012.  (Doc. 78).  As a result, we lifted the stay on March 5, 2012 and directed the

parties to resume briefing on the cross motions for summary judgment.  (Doc. 79).

On April 27, 2012, Plaintiffs filed a brief in opposition to the State

Defendant's motion for summary judgment and a brief in opposition to the Federal

Defendants' motion for summary judgment.  (Docs. 84, 85).  On the same day, the

Federal Defendants filed a brief in opposition to Plaintiffs' motion for summary

judgment, (doc. 86), and the State Defendant filed a brief in opposition to

Plaintiffs' motion for summary judgment.  (Doc. 87).  On May 11, 2012, Plaintiffs

filed reply briefs in further support of their motion for summary judgment, (docs.

88, 91), the State Defendant filed a reply brief in support of its motion for

summary judgment, (doc. 89), and the Federal Defendants filed a reply brief in

further support of their motion for summary judgment.  (Doc. 90).

4

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial.  *Id.* at 325.  Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e)(2).   An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law.  *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine

issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).

Arguments made in briefs "are not evidence and cannot by themselves create a

factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent.*

*Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

However, the facts and all reasonable inferences drawn therefrom must be viewed

in the light most favorable to the non- moving party. *P.N. v. Clementon Bd. of*

*Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement

about the facts or the proper inferences that a factfinder could draw from them.

*Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).  Still, "the

mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; there must be a

*genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477

U.S. at 247-48.

## III.   FACTUAL BACKGROUND

Medicaid is a program created under Title XIX of the Social Security Act,

42 U.S.C. § 1396 *et seq.* ("§ 1396"), designed to provide health care to qualified

individuals.  Federal and state authorities share responsibility for funding and

administering the Medicaid program in a fashion consistent with both federal and

state law.  In accordance with federal law, Pennsylvania must submit a State Plan for Medical Assistance (the "State Plan") to CMS for approval.  Pursuant to 42 U.S.C. § 1396a(a)(5) and 62 Pa. Cons. Stat. § 201, the DPW has been designated as the "single state agency" to supervise the creation and administration of Pennsylvania's State Plan.[5]  Plaintiffs allege that Secretary Sebelius, in her official capacity as Secretary of the U.S. Department of Health and Human Services ("HHS"), is tasked with approving state plans for medical assistance only when they satisfy the requirements of §§ 1396a(a)-(b). (Doc. 1 ¶¶ 5, 14).[6]  One such requirement mandates that state plans provide:

> . . . such methods and procedures relating to the utilization of, and payment for, care and services available under the plan . . . as may be necessary . . . to assure that such payments are consistent with efficiency, economy, and quality of care . . .

---

[5] 42 C.F.R. § 430.10 requires state plans to contain all information necessary for CMS to determine whether the plan can be approved.  The plan must also "provide that it will be amended whenever necessary to reflect (i) [c]hanges in Federal law, regulations, policy interpretations, or court decisions; or (ii) [m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program." 42 C.F.R. § 430.12(c)(1).  The initial approval of a state plan and the subsequent approval of amendments to that plan must be based on a determination that the plan or amendment comports with these and other requirements mandated by 42 U.S.C. § 1396 *et seq. See* 42 U.S.C. § 1316; *See also* 42 C.F.R §§ 430.15(a).

[6] Plaintiffs allege that Secretary Sebelius may, and has, delegated authority to review Pennsylvania's State Plan to Ms. Tavenner, who may, after consultation with Secretary Sebelius, approve or disapprove the plan. (*See* Doc. 1 ¶¶ 5, 6). Additionally, Ms. Tavenner, as Acting Administrator of CMS, is responsible for reviewing Pennsylvania's State Plan amendments so as to "determine whether the plan continues to meet the requirements for approval." *See* 42 C.F.R. §§ 430.12(c)(1), (c)(2).

42 U.S.C. § 1396a(a)(30)(A).   Accordingly, Plaintiffs assert that the Medicaid payments a participating state makes to nursing facility providers must be no greater than what is required to provide efficient and economic care, but high enough to provide for quality care. (*Id.* ¶ 16 (citing § 1396a(a)(30)(A))).

On June 28, 2008, DPW published a notice of a proposed change in its method and standards for computing Medicaid payments made to nursing facilities for fiscal years 2008 through 2011, which authorized use of a budget adjustment factor ("BAF"), explained below in more detail. *See* 38 Pa. Bull. 3561 (June 28, 2008).[7]  The sentiment expressed in this notice was echoed in Pennsylvania's Act of July 4, 2008, P.L. 31, No. 44 ("Act 44"), which provided the following with regard to payments for nursing facility services:

> Subject to Federal approval of such amendments as may be necessary to the Commonwealth's approved . . . State Plan, [DPW] shall do all of the following:

---

[7] Each state is required to provide a public process for the determination of rates of payment for nursing facility services under which: (i) its proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published; (ii) nursing facility providers are given a reasonable opportunity to review and comment on the proposed rates, methodology, and justifications and (iii) the final rates, the methodologies underlying such rates, and justifications for such final rates are published. *See* 42 U.S.C. § 1396a(a)(13)(A).  In a 1997 letter to state Medicaid directors, CMS indicated that "States need only publish proposed rates, methodologies, and justifications prior to the proposed effective date of any changes in payment rates or payment methodologies." (*See id.* ¶ 20, Ex. A).

> For each fiscal year between July 1, 2008 and June 30, 2011, the department shall apply a revenue adjustment neutrality factor[8] to county and nonpublic nursing facility payment rates. For each such fiscal year, the revenue adjustment neutrality factor shall limit the estimated aggregate increase in the statewide day weighted average payment rate so that the aggregate percentage of increase for the period that begins on July 1, 2005 and ends on the last of the fiscal years is limited to the amount permitted by the funds appropriated by the General Appropriations Act for those fiscal years. . . .

Pennsylvania Act of July 4, 2008, P.L. 31, No. 44.[9]

---

[8] The purported purpose of utilizing the revenue adjustment neutrality factor, or BAF, was to "moderate the growth of nursing facility payment rates consistent with the fiscal resources of the Commonwealth, while still providing payment rate increases sufficient to assure that consumers will continue to have access to medically necessary nursing facilities." (Doc. 1 ¶ 49, Ex. G).

[9] The aforementioned notice of June 28, 2008 provided that the methods and standards for payments to nursing facility services participating in the Medicaid Program would be altered. (*See id.*, Ex. B). It detailed the formula for determining rates for nonpublic and county providers. (*See id.*). Based on the Governor's proposed budget, the publication estimated that the percentage rates of increase for nonpublic nursing facilities would be around 0.90551 and would be approximately 1.00 for county facilities. (*See id.*). The publication indicated that DPW would recalculate the BAFs once the General Assembly enacted the General Appropriations Act for 2008-09. To wit, the notice provided that the BAF rate for nonpublic nursing facilities would be: (nonpublic nursing facilities' share of total appropriated fund + estimated annual patient pay amount) divided by the estimated acuity-adjusted annual payments. (*See id.*). The BAF for county nursing facilities would be: 1.00 + the percent increase permitted by the General Appropriations Act. (*See id.*).

Plaintiffs aver that on July 19, 2008, DPW published notices of proposed rates for nonpublic

and county nursing facility providers[10] for the fiscal year ending ("FYE") on June

30, 2009. (Doc. 1 ¶ 34).[11]

On September 30, 2008, DPW submitted to CMS amendments to Pennsylvania's State Plan

implementing the new BAF limitation retroactive to July 1, 2008.  The

amendments were given the identifiers "TN 08-007," applying to nonpublic

nursing facility payment rates, and "TN 08-008," applying to county home

payment rates.[12] (Doc. 1 ¶ 36).  Pursuant to these proposed state plan amendments

("SPAs"), Plaintiffs allege that DPW limited increases in nursing facility provider

rates for the FYE June 30, 2009 by multiplying each nonpublic nursing facility

provider's rate as of July 1, 2007 by 0.90891 and each county home provider's rate

_____

[10] Like the June 28, 2008 notice, this notice provided that, based on the Governor's executive budget, the BAF for nonpublic nursing facilities would be 0.90551 and the BAF for county facilities would be 1.00. (*Id.*, Ex. C).

[11] Plaintiffs contend that while the General Appropriation Act of 2008 had already been signed by Governor Rendell at the time DPW published this notice, the proposed rates and BAFs described therein were based on the Governor's proposed budget and not on the higher amounts actually appropriated at the time. (*Id.* ¶ 34).

[12] Prior to June 30, 2008, Pennsylvania's State Plan did not require the use of a BAF in computing nursing facility provider rates. (*Id.* ¶ 35).  Instead, prior to TN 08-007 and TN 08-008, the Commonwealth of Pennsylvania employed the "case-mix per diem rates" proposed in TN 06-008, which were equivalent to the sum of the nursing facility's net operating rate and its capital rate. (*See id.*).

as of that date by 1.01. (*Id.* ¶ 37).[13]   Plaintiffs allege that DPW did not submit with

these proposed SPAs any information indicating that the resulting payments to

nursing facility providers would be high enough to allow for "quality care," as

required by 42 U.S.C. § 1396a(a)(30)(A), and CMS allegedly did not request the

same. (*See id.* ¶¶ 38, 52).   DPW published the proposed amendments, as submitted

to CMS, in an updated notice in the Pennsylvania Bulletin on November 14, 2008.

(*See id.* ¶ 44).   CMS ultimately approved the amendments on December 12, 2008.

(*See id.* ¶¶ 38, 52).   On March 28, 2009, DPW published notice of the final rates

for nursing facility provider reimbursement for fiscal year July 1, 2008 through

June 30, 2009, which included the BAF rates submitted to CMS in September of

2008. (*Id.* ¶ 53).

Plaintiffs timely filed administrative appeals with the DPW's Bureau of Hearings and

Appeals (the "BHA") to contest the final rates issued in March 2009 for FYE June

30, 2009.   In doing so, Plaintiffs challenged the validity of CMS's approval of TN

08-007 and TN 08-008 and the conformity of the resulting payments with federal

---

[13] Federal Defendants contend that these figures were greater than the rates published in the aforementioned notices because they were based on the figures appropriated to nursing providers under the General Appropriations Act of 2008, which were higher than the figures included in the Governor's proposed budget. (Doc. 24, p. 7).

and state requirements.[14]  This appeal was pending at the time Plaintiffs filed their complaint in the matter *sub judice*, which requests: (i)  declaratory relief against the Federal Defendants pursuant to the Administrative Procedure Act, 5 U.S.C. § 702;[15] and (ii) declaratory and injunctive relief against Secretary Dichter pursuant to the Supremacy Clause of the federal Constitution, U.S. Const. art. VI, Cl. 2.[16]

## IV.        DISCUSSION

### A.                 Plaintiffs' & the Federal Defendants' Motions for Summary Judgment

---

[14] Indeed, Plaintiffs assert that as of January 21, 2009, the limitations contained in the aforementioned amendments have resulted in DPW failing to reimburse nursing facility providers statewide more than 75% of their allowable costs, which are defined as the "costs which are necessary and reasonable for an efficiently and economically operated nursing facility to provide services to residents whose care is paid for by the Medical Assistance Program." (Doc. 1 ¶ 39) (citing 55 Pa. Code. § 1187.2); (*Id.* ¶ 40). Accordingly, Plaintiffs assert that the amendments run afoul of § 1396's mandate that the nursing facility provider payments are "consistent with efficiency, economy, and quality of care."

[15] In this regard, Plaintiffs request the Court to: (i) declare that the federal approval of TN 08-007 and TN 08-008 was arbitrary, capricious, and contrary to law; (ii) set that approval aside; (iii) require Federal Defendants to advise the Commonwealth of Pennsylvania that the approval of TN 08-007 and TN 08-008 has been vacated and may no longer serve as a basis for Pennsylvania's payments to its nursing facility providers; (iv) require Secretary Sebelius to advise the Commonwealth that DPW's July 19, 2008 notice for the fiscal year ending on June 30, 2009 was untimely, improper, and ineffective; and (v) declare that the only approved State Plan provisions relating to the computation of Pennsylvania nursing facility provider's payment rates are those effective as of July 1, 2006 (proposed as TN 06-008), which do not include application of any BAF. (Doc. 1 ¶ 67).

[16] In this regard, Plaintiffs request the Court to: (i) declare that the federal approval of TN 08-007 and TN 08-008 was arbitrary, capricious, and contrary to law; (ii) set that approval aside; (iii) require Secretary Dichter to assure that DPW pays for nursing facility provider services using the rates determined in accordance with the standards in effect prior to TN 08-007 and TN 08-008 and without regard to Act 44, including those approved at TN 06-008; and (iv) preclude Secretary Dichter from any further reliance on TN 08-007 or TN 08-008 in payment determinations for Pennsylvania nursing facilities. (Doc. 1 ¶ 75).

### 1.    The Secretary's Approval of the SPAs under 42 U.S.C. § 1396a(a)(30)(A)

Plaintiffs first move for summary judgment arguing that although the State Defendant provided notice of her *intent* to continue the BAF on June 28, 2008, prior to the enactment of Act 44 on July 4, 2008, DPW failed to submit the SPA until after Act 44 was Pennsylvania law.  (Doc. 50 at 23).  They highlight DPW's statement that the BAF was being continued "to moderate the growth of nursing facility payment rates consistent with the fiscal resources of the Commonwealth, while still providing payment rate increases sufficient to assure that consumers will have access to medically necessary nursing facility services."  (*Id.* at 24 (citing Administrative Record ("A.R.") at 1)).  Plaintiffs emphasize that nothing in the State Defendant's transmittal to the Federal Defendants mentioned compliance with §30(A) or that the resulting payment rates were consistent with economy, efficiency, and quality of care.  (*Id.*).  They claim there is a lack of substantial evidence in the A.R. to support the Secretary's approval because it does not contain the kinds of information required by the Third Circuit in *Rite Aid of Pennsylvania, Incorporated v. Houstoun* that are necessary to uphold a SPA which decreases payment rates to providers.  (*Id.* at 26 (citing 171 F.3d 842 (3d Cir. 1999)).  Moreover, Plaintiffs argue there is a lack of evidence to support the

conclusion that the SPA satisfied all the requirements of the Medicaid Act, or that the Federal Defendants considered all of those factors.

Plaintiffs highlight that the SPAs were necessary because the existing state plan sunset the application of the BAF as of June 30, 2008.  (*Id*. at 26 (citing Act 16 of 2007)).  As a result, they maintain there is nothing in the A.R. indicating that the BAF was passed based upon any rationale other than a purely budgetary one.  Notably, Plaintiffs contend there is no evidence that Defendants conducted a review of the impact of the proposed changes on quality of care.  (*Id*. at 27).  Furthermore, they claim that since the State Defendant has not supplemented the A.R. at any point, the approval of the SPA based on the evidence contained therein constitutes an arbitrary and capricious decision unsupported by substantial evidence.

Plaintiffs argue that nothing in Leuschner's declaration proves that DPW provided the Federal Defendants with any information demonstrating that SPA 08-007 was consistent with the quality of care objectives in the statute.  (Doc. 85 at 21).  They maintain that nothing in the State Defendant's transmittal to the Federal Defendants, (*see* A.R. at 1-28), suggests that the Federal Defendants complied with § 30(A)'s requirement that the payment rates to Plaintiffs be consistent with economy, efficiency, and quality of care.  (*Id*. at 22).

14

Plaintiffs emphasize that while the Federal Defendants may give more attention to economy and efficiency than to quality of care, they may not fail to consider quality of care issues altogether.  (*Id*. at 22-23 (citing *Rite Aid*, 171 F.3d at 854)).  Moreover, they claim the Federal Defendants' contention that they must be presumed to have relied upon approvals of similar BAFs in the past, demonstrates there is little evidence in the A.R. to support their approval of the SPAs.  As a result, Plaintiffs assert that the A.R. makes clear that the Federal Defendants were not aware of what the providers would be losing through approval of SPA 08-007, and as such their approval of the plan lacks sufficient evidentiary support in the A.R.  (*Id*. at 24-25).

In response, the Federal Defendants claim the BAF did not decrease payments rates, but rather, pursuant to DPW's obligation to balance efficiency and economy while maintaining access to quality care, the BAF moderated the annual increase of payment rates so that such payments did not exceed amounts appropriated by Pennsylvania.  (Doc. 86 at 8).  They argue that consistent with *Chevron* deference, the Court should first determine whether the Medicaid Act "is silent or ambiguous with respect to the specific issue," namely, whether the SPAs adhere to Medicaid's public process provision and requirement that payments to providers are consistent with efficiency, economy, quality of care, and maintaining access to care for

Medicaid beneficiaries at least to the extent such services are available to the

general population in the geographic region.  (*Id*. at 13 (citing *Chevron, U.S.A.,*

*Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984))).   They also emphasize that when a

Court is asked to review a decision concerning a complex or technical regulatory

program, *Chevron* deference is appropriate.  (*Id*. (citing *Douglas v. Indep. Living*

*Ctr. Of S. Cal.*, 132 S.Ct. 1204, 1210 (2012); *Wis. Dep't of Health & Family Servs.*

*v. Blumer*, 534 U.S. 473, 497 (2002))).  The Federal Defendants cite the Supreme

Court's decision in *Pharmaceutical Research & Manufacturers of America v.*

*Walsh*, where the Court held that the Department of HHS is "better able than a

court to assemble relevant facts . . . and to make relevant predictions" regarding the

Medicaid program.  (*Id*. at 14 (citing 538 U.S. 644, 672-73 (2003))).

The Federal Defendants argue that the Secretary's review of the SPAs for compliance with 42

U.S.C. § 1396a(a)(30)(A), and subsequent approval of the same, was reasonable.

(Doc. 86 at 15).  They claim the A.R. illustrates that DPW assured the Secretary

that payment rates would increase during the fiscal year by a percentage consistent

with efficiency, economy, and quality of care.  (*Id*. at 16).  Moreover, they

highlight Plaintiffs' inability to provide any evidence that the Secretary failed to

consider quality of care, and instead rely primarily on the contention that the

operative BAF "results in a reduction of 9.0891% from rates based on Plaintiffs'

allowable costs." (*Id*.).  They claim Plaintiffs' argument that the BAF reduces

provider rates mischaracterizes the BAF.

Additionally, the Federal Defendants note that Congress modified CMS's role in approving a

state's Medicaid plan when it passed the Balanced Budget Act of 1997, part of

which repealed §§ 1902(a)(13)(A), (B), and (C) of the Social Security Act, known

as the Boren Amendment.  They note that the Boren Amendment required states to

establish reimbursement rates:

which the State finds, and make assurances satisfactory to the Secretary, are reasonable
and adequate to meet the costs which must be incurred by efficiently and economically
operated facilities in order to provide care and services in conformity with applicable state
and federal laws, regulations, and quality and safety standards.

(Doc. 52 at 38. (citing 42 U.S.C. § 1396a(a)(13)(A))).  Pursuant to case law construing this

amendment, the Federal Defendants claim that CMS was required to more

rigorously scrutinize a proposed amendment only when those assurances were

questionable on their face.  (*Id*. at 39-40 (citing *West Virgina Univ. Hosp., Inc. v.*

*Casey*, 885 F.2d 11 (3d Cir. 1989); *Erie Cnty. Geriatric Ctr. v. Sullivan*, 952 F.2d

71, 79 (3d Cir. 1991))).  Following repeal of the Boren Amendment, they claim,

"[s]tates no longer need to make annual findings that their payment rates are

reasonable and adequate to meet the costs that must be incurred by efficiently and

economically operated providers." (*Id*. at 40 (citing 42 C.F.R. §§

447.253(b)(1)(i))).  In place of the Boren Amendment, 42 U.S.C. §§

1396a(a)(13)(A) and (30)(A) require that states utilize a public process when

implementing state plans and plan amendments, and that state plans include "such

methods and procedures relating to the utilization of, and payment for, care and

services available under the plan . . . as may be necessary . . . to assure that such

payments are consistent with efficiency, economy and quality of care."  (*Id*. at 41

(citing § 1396a(a)(30)(A))).  They further maintain that "Section 30(A), unlike the

Boren Amendment, does not demand that payments be set at levels that are

sufficient to cover provider costs [and] evinces no direct concern for the economic

situation of providers.  Instead, [Section 30(A)] demands that payments be set at

levels that are sufficient to meet recipients' needs."  (*Id*. (citing *Pa. Pharmacists*

*Ass'n v. Houston*, 283 F.3d 531, 538 (3d Cir. 2002))).

However, the Federal Defendants acknowledge that numerous statutory and regulatory

provisions remain applicable, such as the requirement that a state plan specify the

methods and standards used by the state agency to set payment rates and give

assurance that the plan will be administered consistent with the Medicaid Act's

requirements, (*id*. at 42 (citing 42 C.F.R. §§ 430.10 & 447.252)), and the

requirement that a state agency provide that aggregate payments to each group of

health care facilities not exceed the amount that can reasonably be estimated would

have been paid for those services under Medicare payment principles.  (*Id*. (citing

42 C.F.R. §§ 447.272 & 447.321)).   They also highlight that 42 C.F.R. § 430.15(b)

authorizes the CMS Administrator to approve SPAs based on "policy statements

and precedents previously approved by the Administrator."  (*Id*. at 42-43 (citing

*Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 672 (2003) (finding that

"legal conclusions" by the Secretary of Health and Human Services concerning

Medicaid are entitled to substantial deference because the agency has the

institutional capabilities to collect the relevant information and the institutional

knowledge to make informed decisions))).

In this case, the Federal Defendants argue that Leuschner, a representative on CMS's

Medicaid National Institutional Reimbursement Team, had previously reviewed

and recommended for approval Pennsylvania SPAs that provided for application of

a BAF.  (*Id*. at 43-44).  They claim that according to Leuschner, Pennsylvania "had

a payment system in place since the 2005-2006 rate year, pursuant to previously

approved SPAs, under which increases in payment rates to nursing facilities in

Pennsylvania was limited according to a [Budge Adjustment Factor].  Thus, the

BAF aspect of SPAs 08-007 and 08-008 was not new."  (*Id*. at 44 (citing Doc. 52-2

¶ 7)).  Furthermore, the Federal Defendants highlight DPW's acknowledgment that

Pennsylvania had "mechanisms in place for ensuring compliance with the [Section

30(A)] requirements, including inspections, investigations of complaints, and

monitoring." (*Id*. at 44-45 (citing 35 Pa. Bull. 6236 (November 12, 2005))). They also emphasize Leuschner's declaration that he was not aware of any "complaints by beneficiaries or nursing facilities about payments made pursuant to the BAF system, or any other indication that beneficiaries were having trouble accessing care, such as waiting lists to be admitted into nursing facilities." (*Id*. at 45 (citing Leuschner Declaration ¶ 8)).

In addition, during the SPA review, Leuschner inquired whether TN 08-007 would result in the federal government contributing less in Medicaid payments to nursing facility services provided to Medicaid-eligible individuals. (*Id*. at 46 (citing Doc. 52-2 ¶¶ 10-11 ("The box on the Form HCFA-179 submitted for SPA 08-007 shows negative numbers for federal budget impact for fiscal years 2008 and 2009."))). Moreover, Leuschner's contact at DPW informed him that "nonpublic nursing homes were going to be paid more under the proposed rate methodology for state rate-setting year 2008-2009 than they would have been paid if the existing rate structure were not changed. Stated another way, the rate of increase of the payments was decreasing, not the total payments themselves." (*Id*. (citing Doc. 52-2 ¶ 11)). Finally, the Federal Defendants emphasize that DPW offered CMS a spreadsheet illustrating that Pennsylvania's nonpublic nursing facilities were to be paid approximately $6 million more for the federal fiscal year 2008 and $35

million more for the federal fiscal year 2009 under the proposed rate methodology,

which included the BAF, than compared to the 2007-2008 methodology. (*Id.*).

At the outset, we note that a court is to uphold agency action unless it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." *C.K.*

*v. New Jersey Dep't of Health & Human Servs.*, 92 F.3d 171, 182 (3d Cir. 1996).

Moreover, as the Supreme Court recently stated in *Douglas v. Independent Living*

*Center of Southern California, Incorporated*:

The Medicaid Act commits to the federal agency the power to administer a federal
program. And here the agency has acted under this grant of authority. That decision
carries weight. After all, the agency is comparatively expert in the statute's subject matter.
And the language of the particular provision at issue here is broad and general, suggesting
that the agency's expertise is relevant in determining its application.

132 S.Ct. 1204, 1210 (2012). We also find the Third Circuit's statement in *Rite Aid v.*

*Houstoun*, that "although budgetary considerations may not be the sole basis for a

rate revision, they may be considered given that section 30(A) mandates an

economical result," to be particularly instructive in analyzing Plaintiffs' argument.

171 F.3d 842, 856 (3d Cir. 1999) (citing *Ark. Med. Soc'y v. Reynolds*, 6 F.3d 519,

530 (8th Cir. 1993) (finding that HHS may take budget factors into account when

setting payment rates but may not ignore the Medicaid Act's substantive

requirement purely for budgetary reasons)). Furthermore, we highlight that 42

C.F.R. § 447.253(b)(1)(i) states:

[t]he Medicaid agency pays for inpatient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.

42 C.F.R. § 447.53(b)(1)(i).  Similarly, 42 C.F.R. § 430.15(b) authorizes the CMS

Administrator to approve SPAs based on "policy statements and precedents

previously approved by the Administrator."  42 C.F.R. § 430.15(b).

Section 30(A) provides that a state plan for medical assistance must:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan, . . ., as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(1)(A)(30).

Given this regulatory framework, and the deference afforded agency decision-making, we

find that there is substantial evidence in the A.R. to support the Secretary's

approval of the SPAs under section 30(A).  Notably, the Third Circuit in

*Pennsylvania Pharmacists Association v. Houstoun* stated the following in

interpreting section 30(A):

Section 30(A), unlike the Boren Amendment, does not demand that payments be set at levels that are sufficient to cover provider costs.  Unlike the Boren Amendment, it evinces no direct concerns for the economic situation of providers.  Instead, it demands that payments be set at levels that are sufficient to meet recipients' needs.  It is 'phrased in terms benefitting' recipients, and the adequacy of payments is measured in relation to the

health needs of recipients.  It manifests concern solely for the well-being of recipients.  It is therefore apparent from the statutory language that the intended beneficiaries of Section 30(A) are recipients, not providers.

283 F.3d 531, 538 (3d Cir. 2002).  Therefore, it is immaterial whether the Secretary's approval

of the SPAs at issue herein would indeed fail to sufficiently cover providers' costs.

As such, we find *Pennsylvania Pharmacists Association* to constitute yet additional

support for deferring to the Secretary's determination regarding whether the SPAs

were consistent with efficiency, economy, and quality of care.  We also note that

even if the notice as originally provided to the public differed slightly from the

SPA as finally approved, the Third Circuit has found that "[i]n considering whether

the notice was deficient because the final rule differed from the proposed rule, a

reviewing court asks whether the final rule was a logical outgrowth of the

rulemaking proposal and record."  *NVE Inc. v. HHS*, 436 F.3d 182, 191 (3d Cir.

2006).

Additionally, we do not find that the SPAs reduce rates for purely budgetary reasons.

Specifically, we find DPW's statement in its September 30, 2008 letter to CMS to

be illustrative of its consideration of each of the factors contained in section 30(A).

In particular, DPW stated that "[t]he purpose of the BAF is to moderate the growth

of nursing facility payment rates consistent with the fiscal resources of the

Commonwealth, *while still providing payment rate increases sufficient to assure*

23

*that consumers will continue to have access to medically necessary nursing facility services*."  (A.R. at 1).   Therefore, we find that far from basing its decision solely on budgetary grounds, the Secretary's approval was based on a consideration of the factors listed in section 30(A), including the requirement that the plans approved are "consistent with efficiency, economy, and quality of care" to same extent that such care and services are available to the public in that geographic region.  Accordingly, we find Plaintiffs' contention that the Federal Defendants approved the subject SPAs for purely budgetary reasons to be unavailing.

We shall deny Plaintiffs' motion to this extent and grant the Federal Defendants' motion as to the same.

> **2.  The Secretary's Approval of the SPAs under 42 U.S.C. § 1396a(a)(13)(A).**

Plaintiffs also move for summary judgment claiming that when the State Defendant transmitted SPA 08-007 to the Federal Defendants on September 30, 2008, the State Defendant noted that "[t]he Department has provided advanced public notice of its intent to amend its State Plan in a public notice published in the *Pennsylvania Bulletin* at 38 Pa.B. 3561 (June 28, 2008)."  (Doc. 50 at 31).  Despite this representation, they argue that Pennsylvania did not publish its tentative proposed rates for the FYE June 30, 2009 prior to the July 1, 2008 effective date.  Plaintiffs argue that the only notice Pennsylvania published prior to July 1, 2008 was a

notice of its intent to amend the state plan, not an indication of what the proposed rates would be, which were subsequently published on November 15, 2008.  (Doc. 85 at 9 (citing A.R. 19)).  In fact, Plaintiffs highlight that Pennsylvania did not publish its actual proposed rates until November 15, 2008, which were to be retroactively effective as of July 1, 2008, and increased the BAF from 0.90551 to 0.90891 due to the decrease in the total amount of appropriated funds.  (Doc. 50 at 32).  As a result, Plaintiffs claim that the Federal Defendants' determination that SPA 08-007 satisfied the requirements of 42 U.S.C. § 1396a(a)(13)(A), and thus qualified for a July 1, 2008 effective date, is unsubstantiated by the A.R. and must be set aside as unlawful under 5 U.S.C. § 706(2).  (Doc. 85 at 12). In sum, they claim that the Federal Defendants approved the SPA in contravention of the Secretary's own regulations regarding prior notice.

Plaintiffs further contend that DPW's public notices published on June 28, 2008, (*see* A.R. at 5-6), and July 19, 2008, (*see* A.R. at 7-8), fail to satisfy the content requirements of 42 C.F.R. § 447.205(c) because neither provide an estimate of the expected increase or decrease in the annual aggregate expenditures.  (Doc. 50 at 32). Moreover, they claim that the notices fail to identify any county offices where copies of the notice are available for public review.  (*Id*.).  Plaintiffs compare the instant case to *Rite Aid* where the Third Circuit found that DPW's statement in its

public notice in the Pennsylvania Bulletin, which stated "[a] copy of this notice is available for review at local county assistance offices throughout the Commonwealth," satisfied the "bare minimum" of its duty under 42 C.F.R. § 447.205(c)(4).  (*Id*. (citing 171 F.3d at 857)).  Here, they assert, DPW neglected to include any such statement in its June 28, 2008 notice.  They also suggest that DPW did not provide an estimate of the expected increase in aggregate annual expenditures, and thus failed to satisfy the content requirement of 42 C.F.R. § 447.205(c)(2).  (*Id*. at 32-33).

Furthermore, Plaintiffs argue that as of July 1, 2008, DPW was not authorized under Pennsylvania law to continue using the BAF.  (*Id*. at 17 (citing Act of June 30, 2007, Pub.L. 49, No. 16, § 1)).  They highlight that Act 44 at §1 amended 62 P.S. § 443.1(7) and directed DPW to apply the "revenue adjustment neutrality factor" for rate-setting through June 30, 2011, but only if its application was approved by the Federal Defendants."  (*Id*. at 18).  Consequently, Plaintiffs maintain that the previously approved SPA could not have provided for use of the BAF in rate-setting for the FYE June 30, 2009.  (*Id*.).

Plaintiffs also contend that the spread sheet contained in the A.R. at page 30 did not provide the Federal Defendants with rates calculated under the existing rate-setting method.  They suggest that because the approved SPA yields a more than $181 million loss

26

in federal funds to Pennsylvania's nonpublic nursing facility providers, the Federal

Defendants' approval of the SPA does not comply with the requirements of

§30(A).  (Doc. 85 at 19).  Specifically, Plaintiffs contend that the Federal

Defendants approved of SPA 08-007 knowing that it projected a decrease in

federal expenditures by more than $181 million.  (*Id*. at 14 (citing A.R. at 12, 30)).


Plaintiffs distinguish this case from *HCF of Bradford, Incorporated v. Richman*, a § 1983

action challenging the adequacy of DPW's public notice, where the sole issue

before the court was whether the notice "adequately explain[ed] the methodology

and justification underlying the rates."  (*Id*. at 33 (citing 2005 WL 1154426, at *1

(M.D. Pa. Apr. 29, 2005))).  In that case, they highlight that our colleague Judge

Christopher C. Conner denied injunctive relief because he found that the content of

the notice satisfied the requirements of 42 U.S.C. § 1396a(a)(13)(A).  In contrast

here, Plaintiffs contend, the Secretary's December 12, 2008 conclusion that DPW's

08-007 was qualified for approval based on the statutory requirements of 42 C.F.R.

§ 447.205, is unsupported by substantial evidence in the A.R.  (*Id*. at 34).

In addition, Plaintiffs claim that under the APA, an agency must consider relevant data and

articulate an explanation that establishes a "rational connection between the facts

found and the choice made."  (Doc. 85 at 12 (citing *Bowen v. Am. Hosp. Ass'n*, 476

U.S. 610, 626 (1986))).  They also suggest that where an agency's explanation is contrary to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, a court may find the agency's decision arbitrary and capricious.  (*Id*. at 12-13 (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

In particular, Plaintiffs assert that when DPW published its public notice on June 28, 2008, and on July 19, 2008, that it anticipated no increases in State expenditures based on the proposed changes.  (*Id*. at 15).  However, they claim that when DPW published the actual notice of the proposed rates on November 15, 2008, that it projected an increase.  Plaintiffs assert that on November 20, 2008, DPW forwarded to the Federal Defendants an amended Notice of Approval of State Plan Material with corrected information in Box 7 that contained "pen and ink changes" to the originally submitted notice.  (*Id*. at 16 (citing A.R. 22-23)).  They claim that while DPW transmitted the spread sheet information on November 24, 2008, the attachment referenced in the email was not included in the A.R.  (*Id*.).  Plaintiffs also claim that despite subsequent amendments to the original notice, the approved SPA found in the A.R. at page 30 neglects to include any of these changes.  As a result, Plaintiffs maintain there is no rational connection between the Federal

Defendants' finding that SPA 08-007 complies with the requirements of 42 U.S.C. § 1396a(a)(30)(A) and the evidence contained in the A.R. and as a result their approval of the same was arbitrary and capricious.

In response, the Federal Defendants maintain that DPW conducted an adequate public process pursuant to 42 U.S.C. § 1396a(a)(13)(A). For example, it provided public notice of its proposed changes prior to the amendments' effective dates, permitted interested parties to consider the proposed rate adjustment and submit comments over a five month period, and only published the final rates at the conclusion of this process. (*Id*. at 29). They highlight that section 1396a(a)(13)(A) requires states participating in Medicaid to provide "a public process for determination of rates" and that providers must be given "a reasonable opportunity [to] review and comment on the proposed rates, methodologies, and justifications." (*Id*. at 29). The Federal Defendants note that this requirement replaced the Boren Amendment, which required states to make assurances to CMS that institutional provider rates were reasonable and adequate to meet the costs incurred by efficiently and economically operated providers, and that Medicaid recipients would have reasonable access to quality services. (*Id*.).

In addition, regulations found at 42 C.F.R. § 447.205 require an agency to provide public notice of any significant proposed changes in its methods and standards for setting

29

payment rates for services.  (*Id*. at 30).  The Federal Defendants emphasize that

CMS affirmed that a state's public process would satisfy Section 13(A) "provided

that states publish their proposed rates, methodologies underlying the

establishment of such rates, and justifications for the proposed rates prior to the

effective date of new amendments."  (*Id*. at 30-31 (citing *Children's Seashore*

*House v. Waldman*, 197 F.3d 654, 659 (3d Cir. 1999) ("[p]roviders, beneficiaries,

and other concerned state residents must be given a reasonable opportunity for

review of and comment on the proposed rates, methodologies and

justifications.")))  The Federal Defendants contend that other courts in this district

have relied upon that decision in recognizing that notice must only "offer enough

information to allow interested parties to review the underlying process," and must

be published in advance of final implementation of the proposed rates.  (*Id*. (citing

*HCF of Bradford, Inc., et al. v. Richman*, 2005 WL 1154426, at *1 (M.D. Pa. April

29, 2005))).

In this case, the Federal Defendants assert that DPW engaged in a public process prior to

implementing TN 08-007 and TN 08-008, at which time providers were able to

access and comment upon the agency's proposed SPAs.  (*Id*. at 32).  They also

claim that the aggregate rate of increase in payment rates, which factors into

application of the BAF, is determined through submission of the Governor's

Executive Budget in February of each year, at which point it is subjected to a

public legislative process which includes hearings before numerous legislative

committees and budget briefings by the Secretary of Public Welfare.  (*Id.*).

Furthermore, the Federal Defendants contend that DPW published notice of its

implementation of the BAF on June 28, 2008, and that notices of the proposed

rates were published on July 19, 2008 and November 15, 2008.  (*Id.* at 33 (citing

A.R. at 5, 7-8, 17-18, 19-21, 48-50)).  Thus, they assert that DPW's publication of

the proposed changes in the Pennsylvania Bulletin, which provided thirty (30) days

for review and comment, constitutes adequate notice.  Moreover, they claim that

the June 28, 2008 publication satisfies the requirement in § 447.205(d)(1) that

notice be published prior to an amendment's effective date.  (*Id.*).  The notice also

estimated that "the BAF for nonpublic nursing facility payments rates will equal

0.90551 and the BAF for county nursing facility payment rates will equal 1.00."

(*Id.* at 34 (citing A.R. 5, 15)).

The Federal Defendants also dispute Plaintiffs' complaint that the calculations were not based

on "the higher amounts actually appropriated" by the Legislature.  In fact, they

maintain, the state appropriated more money for provider reimbursement than the

amount indicated in the budget as originally proposed.  They cite *Bradford* for the

proposition that "§ 1396a(a)(13)(A) does not require disclosure of each and every

31

procedure employed in compiling information and calculating rates; rather, the agency must offer only enough information to allow interested parties to understand the overall rate-determination process." (*Id.* (citing 2005 WL 1154426, at *2; *NVE, Inc. v. Dep't of Health and Hum. Servs.*, 436 F.3d 182, 191 (3d Cir. 2006) ("[i]n considering whether notice was deficient because final rule differed from proposed rule, a reviewing court asks whether final rule is a logical outgrowth" of the proposal)). The Federal Defendants also emphasize that the Pennsylvania Commonwealth Court in *John XIII Home v. Department of Public Welfare* found that DPW complied with Section 13(A)'s public process requirement by publishing advance notice of its intent to amend the state plan, publishing notice of the proposed rulemaking in the Pennsylvania Bulletin, and providing an opportunity for public review and comments on the policy change, a process they claim mirrors that provided to Plaintiffs in this case. (*Id.* at 35-36). They claim that the November 15, 2008 notice reiterated the formula for calculating the BAF and announced that the amounts appropriated by the Governor's executive budget permitted a reimbursement rate increase of 1%. (*Id.* at 37 (citing A.R. 19-21)). The increased appropriation of funds for Medicaid reimbursement resulted in an increase in the payment rate to nonpublic nursing facilities to .90891. (*Id.* (citing A.R. at 20)). Significantly, DPW published three

notices during the notice-and-comment period, and the Federal Defendants assert

that details of the public process were communicated to CMS when the SPAs were

submitted to the Secretary for approval in September of 2008.  Thus, they claim,

Plaintiffs' assertion that the Secretary and DPW failed to comply with Section

13(A)'s procedural requirements remains unsubstantiated.  (*Id*. at 37-38).

The Federal Defendants further note that Plaintiffs' assertion is incomplete to the extent they

suggest that the rates established prior to application of the BAF were equal to the

providers' allowable costs, and that as such the new rates under the BAF would fail

to cover those costs.  (Doc. 86 at 16).  They highlight the Third Circuit's holding

that unlike the Boren Amendment, section 30(A) "does not demand that payments

be set at levels that are sufficient to cover provider costs [and] evinces no direct

concern for the economic situation of providers.  Instead, [Section 30(A)] demands

that payments be set at levels that are sufficient to meet recipients' [Medicaid

beneficiaries'] needs."  (*Id*. at 17 (*Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d

531, 538 (3d Cir. 2002))).  Furthermore, they emphasize the Third Circuit's

holding that with the repeal of the Boren Amendment's cost reimbursement

language, and its requirement that "payments were to be calculated by reference to

the reasonable costs of providers that were operating in compliance with other

applicable legal requirements," Congress made access to care a primary

33

consideration in setting payment rates.  (*Id*. at 17 (citing *Pa. Pharmacists Ass'n*,

283 F.3d at 539)).  Consequently, the Federal Defendants maintain that the

Secretary's approval of the BAF should not have been based on whether the

resulting rates would cover provider costs, but whether such rates were consistent

with a balancing of efficiency, economy, and quality of care.  (*Id*.).

In addition, the Federal Defendants challenge Plaintiffs' reliance on *Rite Aid* because they

maintain that Plaintiffs fail to highlight any factors considered by the court therein

that were not considered by the Secretary in approving the SPAs at issue in this

case.  (*Id*. at 18).  They note that in *Rite Aid*, the court approved a DPW rate

adjustment and determined that section 30(A) "mandates only substantive

compliance with its specified factors of efficiency, economy, quality of care, and

access" and "does not impose any particular method or process for getting *to* that

result."  (*Id*. (citing 171 F.3d at 851)).  Thus, the Federal Defendants claim

Plaintiffs' argument that the Secretary failed to adequately review the process

DPW followed in enacting the subject SPAs is not actionable under Third Circuit

case law.  (*Id*.).  They distinguish the *Rite Aid* decision by noting that the court's

decision therein dealt with DPW's compliance with section 30(A), and not the

court's review of a federal agency's approval of that process.  (*Id*. at 19 (citing *Rite

Aid*, 171 F.3d at 845 (noting the responsibilities of the states in administering the

Medicaid Program: "[t]he states, in accordance with federal law, establish eligible

beneficiary groups, types and ranges of service, payment levels for services, and

administrative and operating procedures and make payments for services directly

to the individuals or entities furnishing the services.")))

Moreover, the Federal Defendants highlight that when the BAF was initially passed in 2005,

DPW explicitly recognized the quality of care issue in noting that "[t]he obligation

of a provider to provide appropriate, high-quality care is a condition of

participation in the MA program; the obligation exists independent of any

particular payment rate or any feature of the rate setting methodology." (*Id*. at 20

(citing 35 Pa. Bull. 6236 (November 12, 2005))).  Therefore, they suggest that

when Pennsylvania established the BAF, both DPW and CMS could assume that

nursing facility providers were agreeing to provide quality care.  (*Id*. at 20-21

(citing 35 Pa. Bull. 6236 (November 12, 2005) (noting that Pennsylvania had

"mechanisms in place for ensuring compliance with th[e Section 30(A)]

requirements, including inspections, investigations of complaints, and

monitoring.")))  The Federal Defendants contend that *Rite Aid* made clear that

section 30(A) "requires that the state 'assure' certain outcomes, including

efficiency, economy, etc., but it does not call explicitly for any particular findings.

Thus, it is up to a state to determine how it will 'assure' the outcomes." (*Id*. at 21

(citing 171 F.3d at 852)).  Here, they maintain that DPW informed CMS via letter

that the rates would be sufficient to provide adequate access to care.  (*Id*. (citing

A.R. at 1)).  Moreover, the data indicated that under the proposed rate

methodology, Pennsylvania's nonpublic nursing facilities would be paid

approximately $6 million more for federal fiscal year 2008, and $35 million more

for federal fiscal year 2009, than under the methodology used to calculate rates in

the 2007-2008 fiscal year.  (*Id*. (citing A.R. at 1)).

The Federal Defendants assert that based on Leuschner's statement that CMS had previously

approved Pennsylvania's SPAs, which contained a BAF, it was within CMS's

expertise to determine whether DPW's representations concerning approval of the

SPAs, which mirrored those approved in the past, complied with section 30(A).

(*Id*. at 22 (citing 42 C.F.R. § 430.15(b) (stating that approvals may be based on

precedents previously approved by CMS))).  For example, they cite Leuschner's

declaration where he testified that CMS had not received "complaints by

beneficiaries or nursing facilities about payments made pursuant to the BAF

system, or any other indication that beneficiaries were having trouble accessing

care, such as waiting lists to be admitted to nursing facilities."  (*Id*. at 23 (citing

Doc. 52-2 ¶ 8)).  The public was also given a five month interval to submit

comments regarding the SPAs, but they claim that no complaints surfaced during the notice and comment period.

The Federal Defendants argue that from 2004 through 2008, Pennsylvania ranked in the top three states in the nation for expenditures per capita on nursing facilities participating in the Medicaid program.  (*Id*. (citing Steve Eiken *et al*., Medicaid Long Term Care Expenditures Fys 2004-2008, Home and Community Based Services Clearinghouse)).  The Federal Defendants also point to the fact that during the years DPW applied the BAF, Pennsylvania nursing facilities reduced the number of high risk pressure ulcers residents experienced, reduced the use of daily physical restraints, and improved pain management for longer term residents.  (*Id*. at 24-25 (citing Advancing Excellence in America's Nursing Homes, Clinical Quality Measures, Quarter 1 of 2009, at 2)).  They also emphasize that Pennsylvania outranked twenty-five (25) states in performance in three of the four clinical quality measure categories.  (*Id*. at 25 (citing Advancing Excellence in America's Nursing Homes Campaign, State Profiles, First Quarter, 2009, at 4)).  All of this evidence, they contend, demonstrates that the Secretary's approval of the BAF was reasonable in light of the absence of evidence indicating that quality of care suffered as a result of the BAF's application in any of the prior fiscal years.

Finally, the Federal Defendants maintain that under *Chevron* deference, "[i]f the intent of

Congress is clear, that is the end of the matter; for the court, as well as the agency,

must give effect to the unambiguously expressed intent of Congress." (Doc. 52 at

28 (citing *Chevron v. Nat'l Res. Def. Council*, 467 U.S. 837, 842-43 (1984))).

However, "if the statute is silent or ambiguous with respect to [the] specific issue"

a reviewing court must defer to the agency so long as "the agency's answer is

based on a permissible construction of the statute." (*Id*. (citing *Chevron*, 467 U.S.

at 843)). The Federal Defendants claim that while the terms "public process,"

"efficiency," "economy", and "quality care" are not defined in the Medicaid Act or

regulations, the Secretary and CMS Administrator have filled the statutory gap

through case-by-case examination of state plans and plan amendments. (*Id*. (citing

*Minn. Pharmacists Ass'n v. Pawlenty*, 690 F. Supp. 2d 809, 826 (D. Minn. 2010))).


Here, we ultimately find Plaintiffs' arguments to be unavailing. For example, the A.R. makes

clear that when DPW submitted the proposed amendments for approval it stated,

"[t]he purposes of the BAF is to moderate the growth of nursing facility payment

rates consistent with the fiscal resources of the Commonwealth, while still

providing payment rate increases sufficient to assure that consumers will continue

to have access to medically necessary nursing facility services." (A.R. at 1, 9).

Moreover, the court in *Rite Aid* stated that "[a]lthough budgetary considerations may not be the sole basis for a rate revision, they may be considered given that section 30(A) mandates an economical result." 171 F.3d at 856. *See also Ark. Med. Soc'y Inc. v. Reynolds*, 6 F.3d 519, 531 (8th Cir. 1993). In addition, we recognize that this Court's role, as noted by the Federal Defendants, is limited to reviewing the reasonableness of the Secretary's approval of DPW's public process. For instance, in *Wisconsin Department of Health & Family Services v. Blumer*, the Supreme Court, in commenting on the complexity of the Medicaid statutory scheme, wrote "[p]erhaps appreciating the complexity of what it had wrought, Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the [Medicaid] Act." (*Id*. (citing 534 U.S. 473, 497 (2002))).

We agree with the Federal Defendants that the Third Circuit's interpretation of the requirements imposed by section 13(A) further supports the Secretary's construction of 42 C.F.R. § 447.205 and its approval of the SPAs *sub judice*. In *Children's Seashore House v. Waldman* the court found that the Medicaid Act requires publication of the proposed rates, together with the methodologies and justifications that DPW relied upon in establishing those rates. 197 F.3d 654, 659 (3d Cir. 1999) (noting that section (A)(13) "now mandates that a state provide for

'a public process' for determination of rates.  The process requires publications of the proposed rates together with the methodologies and justifications used to establish those rates.  Providers, beneficiaries, and other concerned state residents must be given a reasonable opportunity for review of and comment on the proposed rates, methodologies and justifications.").  In this case, DPW published a proposed change in payment rates in the Pennsylvania Bulletin on June 28, 2008, and provided thirty (30) days for review and comment by interested parties.  (A.R. at 5, 15).

Additionally, the June 28, 2008 notice provided the formula used to calculate the BAF, and described the methodology utilized to determine provider payments rates for county and nonpublic nursing facilities.  (*Id*.).  We again find the reasoning of our colleague Judge Conner in *HCF of Bradford* to be applicable here to the extent he concluded that section 13(A) "does not require disclosure of each and every procedure employed in compiling information and calculating rates; rather, the agency must offer only enough information to allow interested parties to understand the overall rate-determination process."  2005 WL 1154426, *2. Notably, the July and November rate notices, which were supplemented with additional information following CMS's approval of the same, also explained the BAF's proposed impact and provided that the proposed changes could be reviewed

at local county assistance offices.  (A.R. at 7-8, 17-18, 19-21, 48-50).  As the A.R.

makes clear, DPW provided three notices during the operative notice-and-comment

period, and the details of this public process were shared with CMS prior to the

Secretary's approval of the SPAs.

In short, as we agree with the court's reasoning in *Minnesota Pharmacists Association v.*

*Pawlenty*, where it emphasized that courts should not take lightly the agency's

expertise in determining whether a state plan complies with section 30(A) of the

Medicaid Act, we decline Plaintiffs' invitation to disrupt the amply supported

decision of the Secretary to approve the SPAs at issue herein.  *See* 690 F.Supp. 2d

809, 826 (D. Minn. 2010); *see also West Virginia v. Thompson*, 475 F.3d 204, 212

(4th Cir. 2007) ("[w]e take care not lightly to disrupt the informed judgments of

those who must labor daily in the minefield of often arcane policy, especially given

the substantive complexities of the Medicaid statute.").  As the Federal Defendants

emphasize, the District of Columbia Circuit in *Pharmaceutical Research and*

*Manufacturers of America v. Thompson* concluded that the comprehensive nature

of the Secretary's authority "to review and approve state Medicaid plans"

evidenced a congressional "intent that the Secretary's determinations, based on

interpretation of the relevant statutory provisions, should have the force of law."

(Doc. 52 at 26 (citing 362 F.3d 817, 822 (D.C. Cir. 2004))).

Accordingly, we shall deny Plaintiffs' motion for summary judgment in its entirety and grant

the Federal Defendants' motion in its entirety.

**B.**          **The State Defendant's Motion for Summary Judgment**

As we recognized in footnote 26 of our June 29, 2010 memorandum and order:

There is no claim that the State Defendant misapplied the mandates of TN 08-007 or TN 08-008.  To the contrary, it appears that Plaintiffs assert that while the State Defendant implemented the approved amendments as designed, the methodology contained therein was unlawful, rendering State Defendant's conduct unlawful.  Accordingly, we believe that the determination regarding the legality of the Federal Defendants' approval of the amendments is dispositive of the legality of the State Defendant's conduct.

(Doc. 36 at 20 n. 26).  Therefore, given our previous holding, and our finding that the Federal

Defendants' approval of the SPAs was not arbitrary or capricious under the APA,

we shall grant the State Defendant's motion for summary judgment.

**V.**          **CONCLUSION**

For the reasons stated above, we find that the Federal Defendants' approval of the SPAs at

issue, which implemented a BAF for FYE June 30, 2009, is entitled to substantial

deference, was properly approved pursuant to 42 U.S.C. § 1396a(a)(1)(A)(30), and

was properly noticed to the public under § 1396a(a)(13)(A).  In light of the

complex nature of the Medicare and Medicaid statutory schemes created by

Congress, and the wide scope of authority delegated to the Secretary to approve

SPAs such as those at issue here, we find that there is substantial evidence in A.R.

to support the Secretary's decision.

An appropriate order follows.